Good afternoon, Mr. King, I know you've divided up the time, so you can begin whenever you're Good afternoon, Your Honors. May it please the Court, Kevin King on behalf of Boehringer Ingelheim, I'll be addressing our takings, First Amendment, and due process claims. My colleague, Mr. Parrish, will be addressing the APA issue. Your Honors, drug pricing is front and center in the national debate, and there are many steps Congress can take with respect to that issue. But the law is also clear, Your Honors, that there are outer constitutional limits on Congress's action. This case is about those outer limits. The IRA program that we're dealing with in this case, Your Honors, is unprecedented. Congress has enacted scores of other pricing laws, but none of them, not one of them, work the way that this one does. It goes well beyond setting prices for specific drugs, well beyond negotiations between market participants. The program relies on exercises of sovereign regulatory power, not present in other statutes, that give manufacturers no choice but to accept CMS's terms. So, I guess, could we just cut right to the chase? Because we do have limited time. Why don't you just start by explaining why you distinguish Ehrlich versus Sullivan? Glad to, Your Honor. Or are you saying that, which you maybe were trying to say in the briefs, that it's been effectively overruled or something. Well, I appreciate the question. Which is kind of hard because the panel can't overrule a president of this court. So, I don't know if you want to start with why you think Ehrlich doesn't govern. It doesn't govern here for three reasons, Your Honor. The first and most straightforward reason it doesn't govern is that Ehrlich was a regulatory takings case. You see that alluded to several times in that opinion. The plaintiffs there had a regulatory takings claim. And what the Supreme Court has said in Tahoe Sierra is that regulatory takings decisions are not precedent for per se takings claims, the kind of claim that we have here. And there's a good reason for that. So, just to be clear, then, you're not making a regulatory takings claim at all, period? That's right, Your Honor. You are strictly limiting yourselves to the physical takings theory. The per se takings theory, that's right, Your Honor. We swear off any regulatory takings claim. And so, for that reason, Ehrlich doesn't control. But in addition to that, it just can't be the case, Your Honor, that Gerlich, which was decided in 1993, means that Medicare is forever and always voluntary in the sense that it never can affect a taking, right? We're dealing here, in this case, with a program that was enacted in 2022. We're here in 2025. It can't be the case. Medicare is no longer voluntary if it continues to be voluntary. I don't understand how it doesn't continue to control. It said, when a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service, and thus there can be no taking. So, I know you're making the distinguishing regulatory versus physical, but the core of Gerlich is that Medicare is voluntary. Nobody has to participate. So how can it be a physical taking if you don't have to participate? Well, a few things, Judge Bianca. One of them is that the tests, as I was alluding to a moment ago, are different between these two types of claims, right? What you have notice of matters greatly under a regulatory takings claim because it goes to your reasonable investment-backed expectations. That's not a factor. It doesn't change the voluntariness of it. Whether it's regulatory or physical, it's still voluntary, so there can't be a compulsion either way. Well, Your Honor, with respect, this program is not voluntary, and it's not voluntary because it relies on economic coercion to secure compliance. So how does that differ from Gerlich, I guess, going back to that? Because, really, our finding was, look, we said we don't really care how much these people are being squeezed because they alleged. They said, look, anesthesiologists, you know, we can't practice outside a hospital, and because of all these reasons, even under New York law, we're stuck, right? If we want to make any money, we've got to practice in hospitals. And we said, you know, even assuming that's true, tough luck. Economic hardship is not the kind of thing that we're going to, say, render something involuntary. And they were really saying we're ruined. They weren't saying, I mean, I don't really see any distinction between the level of economic hardship they were alleging and the level of economic hardship plaintiffs are alleging here. Well, I mean, both of them were bad. They're claiming. They're claiming we're horrible. They're going to shut us out. It's of no consolation to tell us we'll just go outpatient. They were basically saying, well, under New York law, we can't. I mean, effectively, there are no patients out there because we don't put people under anesthesia outside hospital settings. So I said there were three reasons Gerlich doesn't control them. We've just been talking about two of them, right? Let me give you the third, which is that Gerlich didn't deal at all with the unconstitutional conditions doctrine, which applies in every circumstance where something is voluntary. If you want to say Medicare is voluntary, we disagree with that. We've given you the reasons in our brief. We've given you the Supreme Court's decisions in Carter, NFIB, Butler, Union Pacific, you name it. It's all there. Is that number two? Just by the way, so we fill in the grid here. Number one is it was a per se taking this case. What was your point number two? The point number two is that a case that was decided in 1993 about Medicare in 1993 just necessarily can't mean that Medicare is forever and always immune from being amended in ways. Not that long ago. Well, I guess it depends on your perspective. That's not much of an argument. I mean, I don't know. If it was 2010, would that have been a good case? I mean, that's kind of a random argument. Well, I guess my point is that Medicare has been changed significantly since then, right? And they didn't have an occasion to deal with the statute. But let's set that aside. Let's go to my third reason, which is the unconstitutional conditions doctrine. Every unconstitutional conditions case, Your Honors, deals with something that is voluntary, whether that's a government benefit, a permit, a license, you name it, right? Barringer does not have a right to be in Medicare and Medicaid. But at the same time, the unconstitutional conditions doctrine says that Congress cannot condition that participation on relinquishment of Congress' federal rights. I guess what I don't get here, though, is this is the government as a market participant. And I can kind of see your argument maybe with the excise tax, you know, sort of like that's an exercise of sovereign power to lay some sort of a tax. But that almost seems extraneous to this whole argument. It seems to me that if the excise tax went poof, you would still be making the exact same argument here, right? And at that point, as a market participant, why can't the government, as let's call it a dominant player in the health insurance market, saying, look, yeah, okay, fine, Medicare controls whatever, 50 percent of the market. Well, that just means we've got tremendous control. I mean, I think if Costco, which sells like, I don't know, 92 percent of all the pistachios in America, and I'm making that up, says to the pistachio makers, well, guess what? You know, I'm only going to buy pistachios from you unless you cut the price in half. Tough luck. And then they could do the same thing and say, well, I'm not buying any nuts from you, assuming all the nut producers in America were in a giant cooperative. Say, well, I'm not going to buy your cashews or your walnuts or anything else unless you drop the price of pistachios. There you might have a problem with antitrust law, but you don't have antitrust liability if you're the government. You don't have antitrust liability if you're the government. That's absolutely correct. But isn't that the analogy here, that the government, having exempted itself from the antitrust, they can do that? No, Your Honor, they can't. And the unconstitutional conditions doctrine is the reason they can't. But I think you're homing in on the key issue here. Well, if we didn't have antitrust law, then Costco could do that, right? That wouldn't be unconstitutional. So why is it that it's sort of cosmically unconstitutional for the government as market participant? Because, right, you have to assume that when the government is a market participant, it's acting like a market participant, like the states. When they're acting as market participants, they're not bound by the Dormant Commerce Clause, right? So why is it that all of a sudden there's going to be some kind of unconstitutional condition when they're acting as a market player? And I'm hypothetically putting aside the excise tax because I get that argument. Well, in addition to the excise tax, there are quite a few other things that CMS does here that no ordinary market participant ever could do. No ordinary market participant sets rules that its counterparty in negotiation must follow. No ordinary market participant has the authority, which they explain. Dominant players in the market do, don't they? Take it or leave it. I'm the beast in the market. So, yeah, they do pretty much set the conditions. You want to sell to me? Great. Take it or leave it. I mean, a lot of people do, or a lot of market participants do have such market leverage that they do pretty much dictate the terms of the agreement, don't they? Well, I think the difference here is that there's the civil monetary penalties, for example, that Beringer would have to pay if it didn't comply with CMS's commands. But let me bring it back to the unconstitutional conditions doctrine of this antitrust concept here. Antitrust doesn't apply to the government. But under the conditions doctrine, what applies is leveraging, right? The conditions cases, whether you look at NFIB, USAID, Umber, Northlake, all of those cases. And, by the way, the government says they don't apply in procurement. They absolutely apply in procurement. The Supreme Court's decisions in Northlake and Umber say procurement of goods and services. And I'd point you to pages 724 to 725 of Northlake in particular that says goods or services, right? So just to use an extreme example to maybe draw out the concept here, if the Defense Department said to a contractor, we're not going to buy your fighter jets unless you put out a public statement supporting the president's policy on Ukraine, that would be an unconstitutional condition on the defense contractor's First Amendment rights. But what if they did something different? They said, well, we're not going to buy fighter jets for you unless you drop the price by 50%. And also you've got to drop 50% on the cargo planes and the tanks and the, I don't know, whatever stuff they buy, gold and toilet seats. Sure. And so I think that gets exactly to the kind of leveraging, right? The Supreme Court's cases on unconstitutional conditions speak to distinctions between two kinds of conditions. The first kind of condition, the permissible kind of condition, the one that was at issue in Rust, the first condition that was not challenged in USAID are conditions that define the parameters of the program. We are giving out grant funds for X, so you can only spend your grant funds on X. But critically, there was that second challenged invalidated condition in USAID, that condition that was invalidated in NFIB, the conditions that were invalidated in all these other cases that went too far. They went and they did something else. They were leveraging the government's power to tax and to spend to do something more, to reach outside and to get something from the regulated party. But they're all being done to further the objectives of the program. Isn't that really what it comes down to? If it's furthering the objectives of the program, it's not the example that you gave where it's completely unrelated to the program. All these conditions you're complaining of are all part and parcel of the program, right? Your Honor, the idea that the condition is relevant to the program is not the test. And I'd point you to USAID at page 214 where they say it's not irrelevant to test. That would be too simple or semantic an exercise to allow the government to evade.  So the test is whether or not the government is leveraging. That's the word that the Supreme Court used in these cases, whether or not it's seeking to extract something. Leveraging, I mean, that's clearly overbroad. I mean, again, that would be like saying here that, you know, let's say that they didn't have this particular scheme that we're talking about today. But they said, we're not going to buy drug A from Behringer unless you drop the price on A and B together. Are you saying that that would be an unconstitutional condition? I'm saying that that's subject to the unconstitutional conditions analysis and you've got to run it through and see whether-  Well, why then can you even have no price control if the government says, well, I'm not going to buy drug A from you unless you drop the price 50 percent? Well, let's say there's no tying to anything else. That's still using leverage, right? The leverage, its strength as a market participant, its power, its share of the market. I guess leveraging seems an awfully overbroad term. If that's going to trigger the unconstitutional conditions analysis- Well, it always triggers the analysis. But I guess it's true. There are some forms of leveraging that are not going to be- So then what's the test? What is the yardstick that we use to see whether the leveraging is excessive? So it's proportionality, Your Honor. That's what it says in Nolan and Dolan, and that's the gravamen of all these other cases that are looking at an extent of proportionality. And the problem here is that you've got this tying mechanism in the IRA, which is requiring us, if we don't accept CMS's terms, to go out and to not be able to say, look, CMS, we don't agree with your price for Jardians. We're not going to sell you Jardians. It's not going to be covered. That single drug withdrawal option is not an option, Your Honor. Instead, what the program says is, okay, either hand over Jardians on CMS's terms or else withdraw not only Jardians from Medicare and Medicaid, but all 20-plus of your other- Yeah, we're not going to buy any of yours. We're not going to buy any of yours. Yeah, we're back to Costco, right? Drop your price on pistachios, and I'm not going to buy your cashews. And given that we've already established that the government's not bound by antitrust, then I don't see the constitutional problem with that, unless you're suggesting that somehow antitrust, again, applies as a constitutional matter against the government. No, Your Honor. Antitrust does not apply as against the government. The unconstitutional conditions doctrine does, and what that doctrine says is, just to take NFIB for an example. Of course, there are lots of them. In NFIB, there were two- But that's the only thing the government is trying to extract here is lower price on the drug, right? And the only leverage they're using is, or I won't buy your other drugs. Now, there's the excise tax, too, and I get that. And again, I'm always kind of putting an asterisk out there. But to the extent that they're using as leverage, otherwise, we're not going to buy your other stuff. It seems to me that just boils down to an antitrust case. Your Honor, it's not an antitrust case. It's a conditions case, and it's a condition that reaches beyond, that takes the leverage too far in the sense of NFIB. In NFIB, it was 10% of a state's budget was the old Medicare money. All right, there was- All right. I think we have the argument by Mr. Parrish of his comments. Your Honors, may it please the Court. Ashley Parrish. I'm going to address the- You can also raise the black button on top. There we go. Thank you. I'm going to address the manufacturer agreement and explain why it's unlawful, because it doesn't comply with the Administrative Procedure Act. I'm just going to do two things. First, highlight how extraordinary that agreement is in terms of its terms, and then quickly address the government's two arguments as to why the APA doesn't apply here, both of which are meritless. Your Honors, since 1946, the whole concept of our administrative state has been that if an agency wants to exercise lawmaking power, not just implement a statute, but make up new law, it has to comply with either the Administrative Procedure Act's procedures or alternative procedures that ensure some amount of accountability to the public and to private rights. Your Honor, here what the manufacturer agreement does is it has several provisions that seek to impose binding requirements that go well beyond the statute. I'll highlight just two. One is that everybody who signs this must agree that any requirement in the future determined by the agency to be necessary is binding. That's at section 2E in JA-298. And also that they can amend it at any time to reflect changes in guidance. And we know that guidance is just a policy statement that could be put out. So essentially the agreement under these terms can be changed by the agency at whim at any time to impose new law. Your Honors, our submission basically is that those substantive requirements, at a minimum, had to go through notice and comment subject to judicial review so that the agency could take account of the public's perspectives on this. Well, this is legislation that's subsequent to the APA, and it was passed in a manner that implicitly recognized the impracticality of the ABA's notice and comment provisions because of time exigencies. So the earlier legislation is not binding on subsequent legislation from Congress. Congress can depart from something that it, from requirements that it imposed at an earlier time, especially when there are clear reasons why it's doing so. So, Your Honor, respectfully, I have two responses to that. One is that the language is not clear enough to displace the APA. And second, even if the language were clear enough, this is not what the IRA authorizes. Let me stop you there because it said that it directs them to implement the program's first three years through program instruction or other forms of program guidance. And after that period, beginning in 2028, there's going to be notice and comment, right? So isn't that pretty clear that Congress didn't want this to be slowed down by the notice and comment? It was, for the first three years, going to allow them to use their discretion to issue guidance. Isn't that pretty clear? So, Your Honor, no. But we have two points on this. One is that this is not guidance. So even if that's true. But the second point, Your Honor, is that the question is I don't understand why the district court or in your question, when Congress says proceed by guidance where everybody knows guidance is non-binding policy statements, why you would assume in that that the agency is supposed to at this point, not in the context of just implementing the program, but in the context of a manufacturer agreement, which is treated differently under the statute, can now have free-ranging rulemaking of powers that has never been granted to the agency before. So, Your Honor, we read that provision as. I don't know how you would issue guidance about the program without having guidance about what agreements are going to govern the program. It seems pretty basic. So you. That would be part of the guidance, right? So, Your Honor, I would focus just on the manufacturer agreement. I would say those two provisions that I read to you, there is nothing in there that is necessary to implement the statute. I mean, the idea that they would subject every manufacturer not only to the guidance that is in existence today, but an obligation that they can change that guidance at any point in the future and make it binding, that's not implementing the statute as necessary. The idea that they can implement a binding requirement that every manufacturer comply with anything they think that's necessary in the future, that's not just guidance. So, Your Honor, my main submission is that whatever you think the language of the Inflation Reduction Act means, it isn't broad enough to cover the manufacturer agreement and the idea that they can put new requirements in there. And if you think about it, Your Honor, it's truly an extraordinary power that they're asserting there. The whole concept is that you would have some limits on when unelected agency officials can do more than what Congress says when Congress makes the policy judgments to say that they can just make anything up they want. But, Your Honor, the other thing I would say is that I think the correct reading of the statute is that Congress wanted to slow the agency down. If you take a look at it, the Congress says only 10 drugs, only specific drugs. They must have recognized the damage that price controls pose to innovation, and they said slow down. And so instead of saying go ahead and do anything you want, they said proceed by guidance. But nothing in there in terms of implementing guidance provides any alternative procedures that you would expect to apply. So in the cases like the Asiana Airlines case that the government cites, there are alternative procedures that are designed to ensure that the APA doesn't apply, but there is still the accountability for the decisions that are being made to ensure that the agency complies with what Congress has intended and Congress has made the policy judgments. What we don't see here is any alternative procedures that have been provided. All it says is proceed by guidance. And so then you ask yourself is does the specific requirements in the manufacturing agreement, are they guidance? And they're clearly not. They're binding requirements that go beyond that. All right, thank you, Mr. Parrish. We'll now hear from the government. Thank you, Your Honor. Thank you, and may it please the Court, Max Vivaldi for the government. Faced with escalating Medicare prescription drug costs, which reached $250 billion in 2021, Congress enacted the Drug Price Negotiation Program to target those drugs on which Medicare spends the most money. A manufacturer who makes one of those drugs has a choice. They can keep participating in Medicare or they can withdraw. If they keep participating, then the government makes an offer. They can make a counteroffer. We come to a price. Again, they can take it or leave it, which is how Medicare has always worked. But at the end of the day, those are their options. We badly want to buy their drugs. Jardiance is used by, I think, a million and a half Medicare recipients. They have tremendous leverage if they walk away. But at the end of the day, we'll reach a deal or not. Congress has broad discretion to set the terms of government spending programs, and it didn't exceed that discretion when it implemented this program. I think, as the sort of topside discussion indicated, Gorelick does a lot of work in this case. I think it basically controls this case. My friend tried to distinguish it in three ways. I don't think any of those are effective. So first, he said that Gorelick is a case about regulatory takings as opposed to per se takings, and it's true. You can't apply those cases one-to-one. But the idea that it's voluntary is a cross-cutting idea. Voluntariness defeats both a regulatory taking and a per se taking, and that's the core holding there. I think the idea that it's old doesn't make much of a difference. It's the same program, and the terms have changed in some ways. But I'd point to a case, every circuit that has considered whether Medicare is voluntary in this sort of takings context has reached the same conclusion that it is. I'd point to the 2016 8th Circuit case, Southeast Arkansas Hospice. This is after Horn. This is after NFIB. After all these cases, they changed the analysis, and it reached the same conclusion. And for hospices, the federal government is the primary payer for something like 90% of hospice patients. You can't run a hospice without government funds, but that's still a voluntary program. You can take our money with the terms or not, but you can't pick the terms you'd like a la carte. So do I understand the point you're making is that while the government has a lot of leverage, that the manufacturer of the drug also has a lot of leverage against the government because this is limited to the top drugs. This program is limited to the top drugs, and Medicare can't be successful if it doesn't provide the top drugs to the people. Is that right? Absolutely, Your Honor. And the fact that all the drugs come out I think would harm us significantly. These are drugs that by definition don't have generic competition. So while there might be some other medicine you can provide, it's something that clearly doctors want to prescribe to patients and that the government wants patients to have. And I think if you want to see that this is a real negotiation and that the pharmaceutical companies have leverage, in the first round of drugs, for the first 10 drugs, 40% of the drugs, the government accepted to counteroffer outright. So the government made an offer. Pharmaceutical companies came back and said, we think you should pay more, and here's why. And for four out of 10, we said, yeah, okay, you make a good point. Well, that's a fair price. So I think they do have that leverage. And then when it comes to the unconstitutional conditions doctrine, I'd point to USAID where the court said that Congress can impose conditions that, quote, define the federal program but cannot, quote, prohibit the recipient from engaging in protected conduct outside the scope of the federally funded program. And I agree. We could not control what the pharmaceutical company was doing outside the scope of the program. But I don't think you can define the scope of the program as purchases of a single drug. I think the way Congress has defined the program in the statute is the government's agreement to pay for drugs through Medicare. And this just isn't an unconstitutional conditions case. Well, USAID, they say that there was a provision in there about in-debt prostitution policies that would reduce the transmission of HIV but still violated the recipient's constitutional rights. Why isn't that analogous? So, Your Honor, I think what the court said there and what distinguishes USAID from Rust is that that policy requiring the recipient to adopt that policy is a limitation on the recipient itself, requiring it to go out in the world and say, we have these beliefs, which is not the same thing as saying, here's how you can use our money. I think they say that one of their First Amendment arguments is that they're having to say certain things in the context of these agreements that they don't want to say. Yeah, I think that's not true for a number of reasons. The first, let me just give you some context for this agreement. It is, I think, four and a half pages, four pages in a signature block. It sets out in basic terms how the program works, and it's the way that companies say, yes, we're going to participate, which is how sort of all of Medicare and Medicaid works is with some agreement to participate. And it uses the terms from the statute. It uses maximum fair price, and it uses, it explains that a negotiation is going to happen. But it also makes crystal clear throughout the agreement that the manufacturer isn't agreeing to the government's views. It's just saying it'll participate. This is Volume 2 of the Appendix 299. In signing this agreement, the manufacturer doesn't make any statement regarding or endorsement of CMS's views. The manufacturer is perfectly free to make public statements, saying that the price that's being imposed on us by the government is absolutely unfair. There's no basis for it whatsoever. It's highway robbery. We don't agree with it at all, but we've consented to go along with it because that's good for our business. Absolutely. They can say whatever they want. There's no restriction on their ability to say anything. And what they are doing is not speech at all. It's signing an agreement, which I think is core conduct. And you'd have to ask for a question of whether this conduct is somehow expressive. Are they intending to convey a particularized message? And is there a, quote, great likelihood that the message would be understood by those who view it? This agreement, I can't emphasize enough how obscure this agreement is. The copy that they signed, as far as I know, unless they've made it public, is not publicly available anywhere. The, like, template text is on the CMS website. But the idea that this is the document that is saying, oh, you agree with the government's views and they're locked into that, I think is just not credible. And that's an essential part of your First Amendment argument. I mean you would agree that if this did contain something along the lines of the USAID case, right, where they had to subscribe and say it is our personal belief that, you wouldn't be coming in here and saying, well, that's not a First Amendment violation because they can still go off to a radio station and say the opposite, right? No, if we were imposing a belief on them or some kind of requirement on them as a regulator, if we said you have to participate and also you can't lobby Congress to change the law, that's absolutely a First Amendment problem. Correct. I'm happy to briefly address the APA argument. I think the statutory text is clear. This is Section 11001C of the IRA, which says for three years the Secretary shall implement this, quote, by program instruction or other forms of program guidance. Program instruction or otherwise program instruction or other forms of program guidance is a term of art that appears dozens of times in the statutes that authorize Medicare and Medicaid, and it's the way Congress tells the agency ordinarily everything you do has to go through notice and comment, but this doesn't. I'd also say that what they are challenging is a contract. I'm unaware of any case that says that a contract is a rulemaking, and I don't really see how it could be. But it's clearly program instruction. It's telling people how to comply, how to participate in and comply with the program. So I'm happy to answer any other questions the Court has, but otherwise I don't want to take up too much time. So the judgment should be affirmed. You were so generous with 20 minutes. Well, I appreciate it, but I'm going to enjoy my day in New York if I'm able to. All right, thank you. Four minutes of rebuttal for Mr. King. Thank you, Your Honors. Just one very quick point on the takings and voluntariness points, and I'd like to turn, if I could, to First Amendment. Your Honors, with all respect, this is not voluntary. It wasn't intended to be voluntary, and I think Mr. Baldy said something that's very telling, which is that the drugs governed by this program are single-source drugs, and there are drugs that if there really were a withdrawal option, there would be this possibility of the manufacturers withdrawing and of millions and millions of Americans losing their coverage for these drugs for which there's no real substitute. But Congress plainly didn't, by the design of this program, anticipate that that would happen. Instead, what they did is they set it up in such a way that we have no choice as a practical reality, that we face exactly the same kind of illusory, on-paper-only choice that the farmers in Carter faced, that the states in NFIB faced, and so on. And the anesthesiologists in Garrick faced. Well, that was not a conditions case. And so I don't know. Maybe it is the same kind of case. Maybe they should have played that one differently. But this Court did not in Garrick go through the conditions analysis. And when you do go through that analysis, which is required by Supreme Court precedent, what you find here is that there's exactly the kind of leveraging in this case, as there was in NFIB where you're dealing with more, you know, roughly 10% of a state's budget. Here we're talking about half the market for prescription drugs, more than half of our revenues. So you have the – I agree, it's not every kind of leveraging is a constitutional problem, but this kind is. Now on First Amendment, Your Honors. So USAID is absolutely the right framework for, you know, compelled speech here. And we have the same kind of thing here, like that profession of belief, right? The Supreme Court said, and I'm reading from USAID, that by demanding that funding recipients adopt as their own the government's view on an issue of public concern, the condition by its very nature affects conduct, protected conduct, outside the scope of the federal government. Let me back up a little, and this, I guess, betrays my lack of knowledge of the area. I would have thought that for participation in nearly any government program, whether it be Medicare or Medicaid, you know, participating in selling drugs to TRICARE, that the government has to take it or leave it, form contract, and just going to sign or not. Is that not the case in many government programs? Yes, there's a form contract. So every time the government says, if you would like to contract with us, you have to sign the contract that we have drafted. Is that, by definition, a First Amendment problem? No, it's not. Why not? Why is this different here? I mean, I get that you're happening to bring a claim because you don't like what's in the contract. Maybe some people like the contracts they're forced to speak, and you're right for them. But wouldn't everyone, under your logic, every time they sign a contract that the government has drafted and said take it or leave it, why is that not a First Amendment problem under your theory? Well, because the vast majority of commercial contracts don't involve the same kinds of prominent value judgment statements that we're compelled to make here where we're saying we agree to these prices, that they were negotiated, and that they are the maximum fair – Does every contract say we agreed to do X, Y, Z? I mean, I can't imagine a contract that doesn't say the parties agreed to do the following. So I guess I'm not seeing the word agree being a problem. Maybe there's maximum fair price, although then they have the argument that's simply a statutory term of art, which the contract identifies as statutory term of art. But really, agree? The word agree. Yeah, right. In this context, the word agree is constitutionally problematic, and it's a different case than maximum fair price. But I guess let me, if I could, just turn to maximum fair price because that's the most injurious of all of this. It's a value judgment, and it's not just any value judgment, Your Honor. It's a value judgment that was cited by the President of the United States in his State of the Union address. So this is an issue of public concern, and it's exactly what I was – Isn't it correct that your client would be free to go on television and say, this is not a fair price at all, this is extortion by the government? Yes, Your Honor, and that's constitutionally irrelevant under PG&E. And Hurley, I'd point you to pages 14 to 15 of PG&E and footnote 11 in that case, where what they said is that a disclaimer does nothing to reduce the risk that the speaker will be forced to respond when they strongly disagree. We strongly disagree with the substance of the compelled message. That's antithetical to the First Amendment. So the fact that we can go out, Judge LaValle, and say those things doesn't change the analysis. It was also true in USAID that they could go out and they could say things, but they could only do so, the Supreme Court said, at the price of evident hypocrisy. We can only go out and say in, for example, the commercial market, right, where we charge higher and different prices, that these prices were unfair, right? We're being forced to say that the prices that we charge in that market are unfair by necessary implication. The argument, I take it, turns on your view that this constitutes expressive conduct, and I understand why you say it is, but you would agree that if we find that it's not expressive conduct, then it's not a problem. Well, I don't know how it couldn't be. I mean, at speech, we're signing our name to a document that says that this is the maximum fair price for these drugs when we believe it's not the maximum fair price, and there is that outside-the-program effect in the commercial market. Thank you, both sides. Appreciate your argument today. We reserve the decision.